UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

BRIAN LARSON,

Plaintiff,

- against –

JPMORGAN CHASE Bank, N.A.,

Defendant.

-----------------------------------------------------------------x

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Brian Larson ("Mr. Larson" or "Plaintiff"), by and through his attorneys, Giskan Solotaroff & Anderson LLP and TakeRoot Justice, alleges upon knowledge as to himself and upon information and belief as to all other matters as follows:

**PRELIMINARY STATEMENT**

1. This action is brought against Defendant JPMorgan Chase Bank, N.A., ("JPMorgan") for violating Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII"); the New York State Human Rights Law, N.Y. Executive Law §§ 290 et seq. ("NYSHRL"); and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 et seq. ("NYCHRL").

2. JPMorgan, a global commercial and investment banking institution, hired Mr. Larson as a Senior Associate through JPMorgan's rotational Chase Associate Program ("CAP") in July 2021. Throughout his employment with JPMorgan, Mr. Larson was a dedicated employee. During the first of three performance reviews, Mr. Larson's first manager, Ashlee Kelly ("Ms. Kelly"), gave him the highest possible rating across all benchmarks. Ms. Kelly described Larson as "an all-star" and said that he was one of the best CAP Associates she had ever worked with.

3. Mr. Larson is gay. Shortly after he was hired by JPMorgan, he was nominated to be co-Chair of PRIDE Tri-State at JPMorgan ("PRIDE"). PRIDE is a Business Resource Group which has the mission of engaging and supporting LGBTQ+ employees and promoting an inclusive work environment. Mr. Larson's work for PRIDE was recognized and promoted by JPMorgan on its corporate website and social media pages.

4. Peter Bergman, the second of Mr. Larson's three supervisors in the rotational CAP program, discriminated against and harassed Mr. Larson because of Mr. Larson's sexual orientation. Mr. Bergman criticized Mr. Larson's participation in PRIDE, telling Mr. Larson that he needed to keep his "gay job" separate from his work at JPMorgan, that "DEI wasn't going to save [him]," and "just because [Mr. Larson is] gay doesn't mean [he] get[s] a leg up," among other disparaging comments.

5. Mr. Larson complained about Mr. Bergman's behavior to Elizabeth Manchin who was one of Mr. Larson's supervisors as well as the CAP Program Manager. He also complained directly to JPMorgan's Human Resources Department.

6. The HR Department initiated an investigation into Mr. Bergman's behavior towards Mr. Larson. During and following the HR investigation, Mr. Bergman retaliated against Mr. Larson by overly scrutinizing and criticizing Mr. Larson's performance, removing Mr. Larson from projects, and ultimately, giving Mr. Larson a very low rating on his performance review. In the review, Mr. Bergman again criticized Mr. Larson's involvement in PRIDE.

7. After the rotation with Mr. Bergman's team, Mr. Larson moved onto a third and final rotation where he was once again awarded the highest rating across all benchmarks in his performance review.

8. On October 13, 2023, JPMorgan discriminated against and retaliated against Mr. Larson by forcing him to resign, and thus constructively discharging him.

9. In response to JPMorgan's blatant disregard of federal, state, and local anti-discrimination laws, Mr. Larson brings this action to recover the loss of past and future earnings and benefits, compensatory damages, punitive damages, interest, attorneys' fees, costs, and all other appropriate legal and equitable relief.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

11. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred in this District.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

12. On June 14, 2024, Plaintiff, by and through his attorneys, timely filed a charge of sex discrimination with the Equal Employment Opportunity Commission ("EEOC").

13. On June 29, 2026, the EEOC issued Plaintiff a Notice of Right to Sue. This Complaint has been filed within 90 days of receipt of that notice. Plaintiff has fully complied with all prerequisites to jurisdiction in this Court under Title VII.

14. As required by N.Y.C. Admin. Code § 8-502(c), within ten days after having commenced a civil action alleging violations of the NYCHRL, Plaintiff will mail a copy of this Complaint to the New York City Commission on Human Rights and the Corporation Counsel of the City of New York.

## THE PARTIES

### Plaintiff

15. Plaintiff Brian Larson is a gay man and resident of the State and City of New York.

16. Mr. Larson was employed by JPMorgan as a Summer Associate from June 2020 to August 2020 and then again as a Senior Associate from July 2021 until October 13, 2023.

17. At all relevant times, Mr. Larson was an "employee" within the meaning of all applicable statutes.

### Defendant

18. Defendant JPMorgan is a global commercial and investment banking corporation.

19. Defendant is a Delaware corporation with its principal place of business and headquarters in New York, located at 270 Park Avenue, New York, NY 10017.

20. At all relevant times, JPMorgan was Plaintiff's "employer" within the meaning of all applicable statutes.

## FACTUAL ALLEGATIONS

### Background

21. In 2014, Mr. Larson graduated from Boston University with a Bachelor of Science in Business Administration and a Bachelor of Arts in International Relations with a minor in Mandarin, Chinese. He went on to work as a Senior Account Manager at Pegasystems Inc., a global software company, where he sourced, developed, and closed over $20 million dollars in new business and was twice awarded for being amongst the top 5% of sales executives at the company globally.

22. In 2018, Mr. Larson was admitted to and enrolled in a full-time Master of International Business program at the Fletcher School at Tufts University. During the summer

following his first year of business school, he worked as a Summer Associate at Deloitte Consulting.

23. Following his second year of business school, Mr. Larson worked as a Summer Associate at JPMorgan from June 2020 until August 2020.

24. Mr. Larson received positive feedback that summer and in or around August 2020, JPMorgan extended him an offer to return to the company full-time following his graduation through its prestigious Chase Associate Program ("CAP"). Mr. Larson accepted the offer.

25. CAP is a two-year rotational program that seeks to develop future leaders at JPMorgan. CAP Associates perform three successive eight-to-ten-month placements on different business project teams. CAP's purpose is to help participating employees develop management skills and gain an understanding of JPMorgan's business through exposure to multiple business units.

26. According to the CAP website at the time of Mr. Larson's employment, upon completion of the program, participants will "apply [their] general management experience into other roles within [JPMorgan Chase] Consumer & Community Banking."[1]

27. At JPMorgan and amongst CAP participants, there is an understanding and expectation that CAP Associates will be promoted to Vice President ("VP") roles at JPMorgan at the conclusion of the rotational program.

---

[1] JPMorgan's website currently states, "The Chase Associate Program is designed to provide you with a uniquely broad set of experiences that will help you advance in your career and become a future leader at the firm... ." Chase Associate Program Full-Time, JPMORGAN CHASE CAREERS, https://www.jpmorganchase.com/careers/explore-opportunities/programs/cl-fulltime-associate (last visited Aug. 12, 2026).

28. Before Mr. Larson accepted his employment offer as a Senior Associate and CAP participant, the then-head of the CAP program (Elizabeth Manchin's predecessor) told him that nearly every participant in CAP would become a VP at JPMorgan at the end of the program.

29. Additionally, at a Reaching Out LGBTQ+ MBA ("ROMBA") recruiting event in October 2019, members of JPMorgan's recruitment team stated that, of the prior year's CAP cohort, 98% of CAP participants were promoted to VP positions at the conclusion of the program and that only a few participants accepted employment offers outside JPMorgan.

30. Ms. Manchin repeated this information to Mr. Larson and other members of his CAP cohort throughout the program, especially during the second and third rotations when competing banks attempted to recruit CAP participants away from JPMorgan.

31. As a Senior Associate and CAP participant, Mr. Larson's primary responsibilities included, but were not limited to, designing and implementing business campaigns, leading teams, developing market strategies, identifying and maintaining business relationships, and creating reports and briefings for senior management.

32. Like all other CAP participants, Mr. Larson received a 12 percent bonus in January of 2022. First year CAP participants' bonuses are lower than other bonus-eligible positions at JPMorgan because the program begins halfway through the year.[2]

33. For his first rotation in CAP, Mr. Larson was placed on the Real Estate Market Expansion (New Builds) Team where he reported to Ashlee Kelly, Vice President of Corporate Real Estate, from July 2021 through around March 2022.

---

[2] Mr. Larson's next annual performance bonus was scheduled to be paid in January 2024 and would have been based predominantly on his performance during the CAP program. This is because he would only have recently transitioned into a post-CAP role before JPMorgan's year-end performance review process for non-CAP employees. Because JPMorgan forced Mr. Larson to resign before the January 2024 bonus payment date, he was denied his bonus payout for his second year in CAP.

34. At the end of each CAP rotation, CAP Associates are reviewed by their manager in each of three categories: 1. Day-to-day work; 2. Commitment to the rotational team; and 3. Commitment to JPMorgan overall. In each category, participants can receive one of three ratings: "exceeds expectations," "on track," or "fails to meet expectations."

35. Around January 2022, Ms. Kelly reviewed Mr. Larson as "exceeds expectations" in each of the three categories for his Real Estate Market Expansion (New Builds) rotation.

36. Ms. Kelly wrote to Mr. Larson that he was "one of the best CAPs she had ever worked with" and referred to him in emails as "an all-star."

37. It was uncommon for a CAP Associate to receive "exceeds expectations" in all three categories during a first rotation. Typically, CAP Associates receive "exceeds expectations" ratings in only one or two categories.

**Plaintiff's Participation in JPMorgan's Affinity Groups**

38. From June 2020 to August 2020, during his time as a Summer Associate at JPMorgan, Mr. Larson reached out to senior managers and employees who identified as LGBTQ+ for informal "coffee chats."

39. Around July of 2020, Mr. Larson scheduled a coffee chat with Joe Evangelisti, the Managing Director and Head of Worldwide Corporate Communications and Media Relations for JPMorgan.

40. Mr. Larson asked Mr. Evangelisti if he believed JPMorgan had an accepting culture towards LGBTQ+ individuals.

41. Rather than answering directly, Mr. Evangelisti shared an anecdote about a conversation he had with Jamie Dimon, the CEO of JPMorgan. In that conversation, Mr. Dimon had apparently asked Mr. Evangelisti to explain the Kinsey scale to him.[3]

42. Mr. Evangelisti told Mr. Larson that he then explained the Kinsey scale to Mr. Dimon such that everyone falls somewhere along the scale. Mr. Dimon then bizarrely responded that if this were the case then he, Mr. Dimon, "could be 17% gay."

43. Upon information and belief, Mr. Dimon is heterosexual.

44. Mr. Larson found Mr. Evangelisti's decision to share this anecdote in response to his question strange and considered Mr. Dimon's apparent attempt to turn the Kinsey scale into a joking matter both odd and offensive.

45. To say the least, he was surprised to hear that the CEO of JPMorgan was making identity-based jokes. He hoped that JPMorgan's LGBTQ+ and other inclusivity initiatives reflected genuine commitment rather than a performative display of corporate virtue.

46. When Mr. Larson returned to JPMorgan as a Senior Associate and CAP participant in July 2021, his supervisor, Ms. Kelly, nominated him to join Maureen Yandrisevits, an Executive Director, as a Co-Chair of PRIDE Tri-State at JPMorgan Chase.

47. As a Co-Chair of PRIDE, Mr. Larson led community engagement, working internally at JPMorgan and externally with non-profit partners.

48. Mr. Larson's involvement in PRIDE was well known at JPMorgan. Mr. Larson frequently posted about his work with PRIDE on LinkedIn and he was featured on JPMorgan's corporate site and social media handbook during Pride Month in June 2022.

---

[3] The Kinsey Scale is a tool and classification scheme that measures sexual orientation by a scale of queerness, ranging from 0 (exclusively heterosexual) to 6 (exclusively homosexual).

**Plaintiff's Second Supervisor Harasses and Discriminates Against Him Based on his Sex and Sexual Orientation**

49. For his second rotation, JPMorgan placed Mr. Larson on the Growth Segments (Students) Team where he reported to Peter Bergman, Executive Director of Chase Consumer Bank, College and Starter Segment. Mr. Larson worked on the Growth Segments (Students) Team from around March 2022 through January 2023.

50. As a part of his work for the Growth Segments (Students) Team, Mr. Larson traveled to JPMorgan branches across the United States and met with over 500 JPMorgan employees and University Branch Managers.

51. Around May 6, 2022, Ms. Manchin and Chardiney Jackson, Talent Development and Pipeline Leader, who also worked with CAP, nominated Mr. Larson to be his CAP Class Ambassador.

52. For each CAP class, a leader is identified and nominated as Ambassador to mentor other CAPs, liaise with the CAP class about events at JPMorgan, represent the CAP program at upcoming conferences, and plan and execute an event for current and past CAP participants every other month.

53. Mr. Larson accepted the nomination, and JPMorgan sent him a cake and congratulatory note to commemorate the achievement.

54. At JPMorgan, managers had to apply to have CAP Associates on their teams. As part of that application, managers have to identify a long-term project that the CAP Associate would work on during their rotation.

55. Early on in his rotation with the Growth Segments (Students) Team, Mr. Larson noticed that Mr. Bergman did not have a defined, long-term project identified for him to work on.

56. In or around late June 2022, Mr. Bergman called Mr. Larson into an unplanned Zoom meeting on a Friday afternoon. During the call, Mr. Bergman told Mr. Larson he was spending too much time on his work with PRIDE and told him he needed to "separate [his] gay job from [his] day job." He also referred to Mr. Larson's work with PRIDE as an "extracurricular" activity.

57. Mr. Larson asked Mr. Bergman if he believed that Mr. Larson's work with the Growth Segments (Students) Team was suffering. Mr. Bergman replied, "Your work is not suffering now, but I could see it happening."

58. At the time, Mr. Larson worked full-time, 60 to 70 hours per week, for the Growth Segments (Students) Team and completed his PRIDE work outside of and in addition to those hours.

59. Mr. Bergman's comments upset Mr. Larson. Mr. Larson reported the conversation and the "gay job" comment to Elizabeth Manchin, the CAP Program Manager, the following Monday via telephone. During the conversation, Ms. Manchin told Mr. Larson that "PRIDE activities are not extracurricular" and that PRIDE was "a part of how we do business at Chase."

60. Ms. Manchin said that she would speak to Mr. Bergman, and that CAP leadership would "handle it."

61. Around July 6, 2022, Mr. Larson reached out to Ms. Kelly, his first rotation supervisor, to solicit her advice on how to handle the situation with Mr. Bergman.

62. On a July 7, 2022 phone call, Mr. Larson told Ms. Kelly about Mr. Bergman's "gay job" comment. Ms. Kelly cautioned him against bringing anything up to HR because "it does not always turn out the way you want it to." Mr. Larson took this to mean that raising complaints about discrimination could have negative career consequences at JPMorgan. Nonetheless, Ms. Kelly

assured him that "he did the right thing" by reporting Mr. Bergman's discriminatory behavior to Ms. Manchin and encouraged him that he "would get through this."

63. Soon after, in July 2022, Mr. Larson received an email from Brian Lamb, the Global Head of Diversity, Equity, and Inclusion ("DEI") at JPMorgan. The email recognized Mr. Larson's commitment to DEI and said that in his upcoming performance review, his manager would be instructed to incorporate Mr. Larson's DEI work into each of the three categories of his review.

64. Mr. Larson suspected that the email was also sent to the heads of other Business Resource Groups (i.e., Voice for Employees that Served ("VETS"), Advancing Black Pathways, Women on the Move, etc.).

65. Mr. Larson submitted his portion of the performance evaluation (a self-evaluation with the same categories as the manager evaluation) around August 2022.

66. Mr. Bergman replied to Mr. Larson's self-evaluation writing, "I see this email from Brian Lamb, but I want you to know that I am not including any of your PRIDE activities in your performance review."

67. At this point, it was clear to Mr. Larson that Mr. Bergman had something against Mr. Larson because he was gay and because he was involved in PRIDE.

68. Indeed, in a meeting to discuss the issue of Mr. Larson's work for PRIDE being credited in his review, Mr. Bergman told Mr. Larson, "Just because you are gay doesn't mean you get a leg up."

69. Mr. Larson lodged additional complaints with Ms. Manchin through a series of emails and Zoom calls where he expressed concerns about Mr. Bergman's comments and Mr. Bergman's stated opposition to the directive from Brian Lamb about his performance review.

70. Ms. Manchin responded that the situation "was not right" and again said that she would talk to Mr. Bergman.

71. Shortly after Mr. Larson raised his concerns about Mr. Bergman's behavior to Ms. Manchin, Mr. Bergman removed Mr. Larson from projects such as working with marketing partners to drive business for the Growth Segments (Students) Team.

72. Instead, and in an apparent retaliatory move, Mr. Bergman assigned Mr. Larson to the same project as the Growth Segments (Students) Team's undergraduate intern. This project involved secondary Excel analysis on topics for which JPMorgan had already engaged third-party consultants and was a patently inappropriate assignment for a CAP Associate.

73. In addition, Mr. Bergman began to require daily check-ins with Mr. Larson, while everyone else on the Growth Segments (Students) Team had weekly or biweekly check-ins.

74. During these check-ins, Mr. Bergman overly scrutinized Mr. Larson's work. Mr. Bergman frequently mentioned that he was in close communication with CAP leadership, which Mr. Larson interpreted as a threat.

75. In September 2022, Mr. Larson also reported Mr. Bergman's discriminatory harassment to JPMorgan's employee hotline. Shortly thereafter, he received an invitation to a meeting with JPMorgan's HR Department.

76. During that meeting, HR informed Mr. Larson that someone else within JPMorgan had "raised a red flag" about Mr. Bergman's behavior. Mr. Larson presumes that it was Ms. Manchin.

77. HR said that it would investigate the allegations and that Mr. Larson's identity as the complainant would be kept anonymous.

78. Mr. Larson asked how the complaint against Mr. Bergman could be anonymous when he was the only gay person on the team. HR replied that it could not control that.

79. HR interviewed Mr. Larson about his experience with Mr. Bergman twice within a three-week period in September or October 2022.

80. Approximately one week after the second HR interview, in October 2022, HR informed Mr. Larson that it was launching "an official investigation" into Mr. Bergman's conduct.

81. After the launch of the HR investigation, Mr. Bergman's scrutiny of Mr. Larson's work only increased.

82. In December 2022, Mr. Bergman invited Mr. Larson to another call. Rather than addressing his inappropriate and discriminatory conduct towards Mr. Larson throughout his rotation, Mr. Bergman adopted a menacing tone and said, "You know, Brian, your final placement out of this program is not a sure thing."

83. Mr. Larson responded that he had one CAP rotation remaining and that if he did not receive a VP offer from his first or third rotation, he could still apply elsewhere at JPMorgan.

84. Mr. Bergman replied, "My review of you is in the system as a living artifact." Mr. Bergman added that "DEI is not going to save you."

85. Mr. Larson felt very threatened and left the call in tears.

86. Shortly thereafter, later in December 2022, Mr. Larson received his final performance review from Mr. Bergman. Mr. Bergman wrote, "I wish Brian [Larson] demonstrated the same passion for the Students Group Growth Segment that he does for his LGBTQ community."

87. Mr. Bergman rated Mr. Larson as "on track" for each review category. Three "on track" ratings is considered to be a poor review in CAP.

88. Mr. Larson concluded that Mr. Bergman gave him these low ratings in retaliation for his complaints to Ms. Manchin and HR. He then reported the retaliation to Ms. Manchin and Ms. Jackson.

89. Around that time, in December 2022, HR called Mr. Larson and told him that they had completed the investigation and had not found any evidence of discrimination. Mr. Larson asked what that meant and HR replied that "there was no credible evidence that Mr. Bergman discriminated against [Mr. Larson]." Mr. Larson asked what the investigation entailed, and HR responded that it could not disclose that information. HR did not inform Mr. Larson of any option to appeal the decision.

90. For his third and final rotation, Mr. Larson was placed with the Wealth Management (Affluent Strategy) Team from approximately January 2023 until October 2023.

91. Mr. Larson first reported to Justin Evans, Head of Affluent Strategy, US Wealth Management.

92. In or around March or April 2023, Mr. Evans told Mr. Larson that he was exceeding expectations across all three areas of review and that he intended to give him three "exceeds expectations" for his mid-rotation review.

93. Shortly after, around June 2023, Mr. Evans left the Affluent Strategy Team as a part of a reorganization and Mr. Larson began reporting to Meredith Karson, the Managing Director of the Product and Experience Wealth Management Team, for the remainder of the rotation.

94. Around June or July 2023, Ms. Karson told Mr. Larson that she would "love to hire him" onto her team permanently but could not do so due to a hiring freeze in Wealth Management.

**JPMorgan Discriminates and Retaliates Against Plaintiff by Terminating His Employment**

95. In or around May 2023, Mr. Larson began applying to open positions across different teams at JPMorgan.

96. Mr. Larson had numerous interviews with various hiring members and teams. He would repeatedly advance far in the hiring process only to be met with a halt in communications or a message that the team had decided to "go in a different direction."

97. In or around August or September 2023, Micheale Striblin, Managing Director of Branch Technology, verbally offered Mr. Larson a Product Manager role based in New York City. She said that he was a "great fit" for the role and that he would soon receive a formal offer letter from HR.

98. In addition to Ms. Striblin, Mr. Larson spoke to Becky Griffin, head of Home Lending Servicing and Support Operations, and other members of the team, about the Product Manager role.

99. Mr. Larson discussed the offer with Ms. Kelly. Both Ms. Kelly and Ms. Striblin worked in the same division and reported to Managing Director John McGinley, Head of Retail Real Estate. Ms. Kelly said that she thought the role and team were a great fit for Mr. Larson.

100. Soon after, HR contacted Mr. Larson to tell him that JPMorgan had decided that the role would report out of Columbus, Ohio instead of New York City.

101. JPMorgan maintained geographically tiered compensation structures, with New York classified as a higher-cost compensation market than Columbus. As a result, JPMorgan's decision to move the role from New York to Columbus materially reduced Mr. Larson's expected compensation and additionally required him to relocate.

102. For these reasons, Mr. Larson had no choice but to turn down the Ohio offer.

103. Between July 2023 and February 2024, Mr. Larson applied to approximately 50 roles at JPMorgan. Of those applications, he was interviewed by a hiring manager or the team approximately 35 to 40 times. Mr. Larson completed at least 10 full interview cycles, meaning that he was one of two finalists.

104. JPMorgan did not make any other offers to Mr. Larson for a new internal role.

105. Mr. Larson could sense that the individual team members who interviewed him liked him and were excited about his candidacy. However, in each case, he seemed to hit an invisible wall when his application advanced. It became obvious that Mr. Bergman's retaliatory performance review and/or other negative information associated with his complaints of discrimination was affecting his ability to obtain another position within JPMorgan.

**JPMorgan Pretextually Accuses Mr. Larson of Wrongdoing and Forces him to Resign**

106. On October 9, 2023, Mr. Larson received a meeting invite from HR. During that meeting, HR told him that there were two Uber rides that he expensed to JPMorgan that "raised questions about his trustworthiness and honesty." The two Uber rides were from June 2023 Pride Month events that Mr. Larson attended as a part of his work with PRIDE.

107. Mr. Larson informed HR that he received approval from his manager to attend the events and to charge the Uber costs to JPMorgan. The charges were approximately $40 total.

108. HR said that they would confirm with his manager and follow up with Mr. Larson if they needed more information. HR subsequently informed Mr. Larson that it had found no policy violation regarding these expenses.

109. On October 13, 2023, HR requested another meeting with Mr. Larson via Zoom. Ms. Manchin was also present on the Zoom call.

110. HR informed Mr. Larson that he needed to resign. Mr. Larson asked why. HR told him that his "time with CAP had run out." Mr. Larson responded that he had been actively trying to obtain another internal role and had gone through a tremendous number of interviews and hiring processes.

111. HR failed to meaningfully engage with Mr. Larson's response. Instead, HR told Mr. Larson that if he did not resign, he would be fired, and that the termination would be on his record, negatively impacting his chance of being rehired by JPMorgan in the future.

112. HR did not identify Mr. Larson's performance, Uber expenses, any sort of misconduct or any other specific policy violation as the reason JPMorgan was requiring his resignation at the time.

113. HR instructed Mr. Larson to log onto a portal and share his computer screen so they could observe him submitting the resignation. HR instructed Mr. Larson on what option buttons to click. If there were terms in fine print, Mr. Larson was not given an opportunity to read them.

114. On November 3, 2023, Mr. Larson received a text message from Paul Schulman, another CAP participant. Mr. Larson and Mr. Schulman were the two of three openly gay people in their CAP cohort. Mr. Schulman texted that he thought JPMorgan was "lowkey homophobic."[4]

**Mr. Larson's Resulting Emotional Distress**

115. The discrimination, harassment, and retaliation that Mr. Larson suffered at JPMorgan caused him to experience significant emotional distress.

---

[4] The third openly gay CAP participant did not receive a VP-level placement and instead accepted a position at a lower level than the Senior Associate level held during CAP. Nearly everyone else in the cohort received the expected VP-level placement.

116. Due to his emotional distress, Mr. Larson gained approximately 20 to 25 pounds from the time he started working with Mr. Bergman in March 2022 through his termination in October 2023.

117. From the time he started working with Mr. Bergman and after his termination, Mr. Larson experienced intense anxiety, panic attacks, depression, and insomnia.

118. Mr. Larson developed a resurgence of trichotillomania, a hair-pulling disorder often triggered by stress, which he had not experienced since childhood. This resulted in noticeable bald patches on his scalp, eyebrows, and eyelashes.

119. Mr. Larson's long-term partner and his parents noticed these physical changes and the change in his mood.

120. In 2022, Mr. Larson's primary care doctor prescribed him a new antidepressant to help with the depression, anxiety, and weight gain he experienced during his time working under Mr. Bergman. His doctor also recommended that he see a therapist. Mr. Larson took his doctor's suggestion and began seeing a therapist for work-induced stress.

121. Mr. Larson has suffered from chronic migraines since his early twenties. Up until his rotation with Mr. Bergman, Mr. Larson's migraines were controlled with a treatment plan and kept under control for years. After he started working with Mr. Bergman, his migraines stopped responding to treatment and became less manageable and much more severe.

**Subsequent Employment and Continued Emotional Distress**

122. After his termination from JPMorgan, Mr. Larson applied to approximately 25 to 30 positions, both at JPMorgan and externally at other companies.

123. In March 2024, he was hired by a financial services management consultancy as a Senior Manager on the Asset and Wealth Management team.

124. Mr. Larson received positive feedback during his tenure at the financial services management consultancy.

125. However, the severe migraines that resulted from the stress he experienced at JPMorgan crescendoed after his termination and became debilitating, making it impossible for him to continue working.

126. In July 2025, Mr. Larson left his position at the financial services management firm and was subsequently approved for Social Security Disability Insurance benefits.

**FIRST CAUSE OF ACTION**
**Title VII of the Civil Rights Act of 1964 – Discrimination**
*Against Defendant JPMorgan*

127. Plaintiff realleges and incorporates by reference the foregoing allegations as if set forth fully here.

128. Plaintiff is a gay man and was qualified for his position when Defendant terminated him.

129. Defendant was aware that Plaintiff is gay.

130. Defendant did not terminate similarly situated employees who were heterosexual.

131. By the actions described above, Defendant discriminated against Plaintiff on the basis of his sex in violation of Title VII by subjecting Plaintiff to disparate and worse treatment based on his sexual orientation, including by terminating his employment.

132. As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, as well as economic damages, for which he is entitled to an award of monetary damages, attorney's fees and other relief.

133. Defendant's unlawful and discriminatory actions were intentional, done with malice, and/or showed a deliberate, willful, and wanton and reckless indifference to Plaintiff's rights under Title VII, entitling Plaintiff to an award of punitive damages.

**SECOND CAUSE OF ACTION**
**Title VII of the Civil Rights Act of 1964 – Retaliation**
*Against Defendant JPMorgan*

134. Plaintiff realleges and incorporates by reference the foregoing allegations as if set forth fully here.

135. By the acts described above, Plaintiff engaged in protected activity by complaining about unlawful employment practices and Defendant retaliated against Plaintiff in the terms and conditions of his employment, subjecting him to increased scrutiny, negative reviews and abusive verbal behavior, and ultimately terminating his employment, in violation of Title VII.

136. Defendant terminated Plaintiff because he complained of discrimination based on his sex.

137. As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, as well as economic damages, for which he is entitled to an award of monetary damages, attorney's fees and other relief.

138. Defendant JPMorgan's unlawful and discriminatory actions were intentional, done with malice, and/or showed a deliberate, willful, and wanton and reckless indifference to Plaintiff's rights under Title VII, entitling Plaintiff to an award of punitive damages.

**<u>THIRD CAUSE OF ACTION</u>**
**New York State Human Rights Law – Discrimination**
*Against Defendant JPMorgan*

139. Plaintiff realleges and incorporates by reference the foregoing allegations as if set forth fully here.

140. Defendant JPMorgan employed Plaintiff within the meaning of the NYSHRL.

141. By the acts described above, Defendant discriminated against Plaintiff on the basis of his sexual orientation in violation of the NYSHRL.

142. As a direct and proximate result of Defendant's unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, as well as economic damages, for which he is entitled to an award of monetary damages, attorney's fees and other relief.

143. Defendant JPMorgan's unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's right under the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

**<u>FOURTH CAUSE OF ACTION</u>**
**New York State Human Rights Law — Retaliation**
*Against Defendant JPMorgan*

144. Plaintiff realleges and incorporates by reference the foregoing allegations as if set forth fully here.

145. Defendant JPMorgan employed Plaintiff within the meaning of the NYSHRL.

146. By the acts described above, Defendant retaliated against Plaintiff in the terms and conditions of his employment for opposing unlawful employment practices, subjecting him to increased scrutiny and harassment, and ultimately terminating him, in violation of the NYSHRL.

147. As a direct and proximate result of Defendant's unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental

anguish and emotional distress, as well as economic damages, for which he is entitled to an award of monetary damages, attorney's fees and other relief.

148. Defendant's unlawful, retaliatory, and discriminatory actions were intentional, done with malice, and/or showed a deliberate, willful, and wanton and reckless indifference to Plaintiff's rights under the NYSHRL, entitling Plaintiff to an award of punitive damages.

## FIFTH CAUSE OF ACTION
**New York City Human Rights Law — Discrimination**
*Against Defendant JPMorgan*

149. Plaintiff realleges and incorporates by reference the foregoing allegations as if set forth fully here.

150. Defendant JPMorgan employed Plaintiff within the meaning of the NYCHRL.

151. By the acts described above, Defendant discriminated against Plaintiff based on his sexual orientation and harassed him in violation of the NYCHRL.

152. As a direct and proximate result of Defendant's unlawful and discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, as well as economic damages, for which he is entitled to an award of monetary damages, attorney's fees and other relief.

153. Defendant's unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's right under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## SIXTH CAUSE OF ACTION
**New York City Human Rights Law — Retaliation**
*Against Defendant JPMorgan*

154. Plaintiff realleges and incorporates by reference the foregoing allegations as if set forth fully here.

155. By the acts described above, Defendant retaliated against Plaintiff in the terms and conditions of his employment for opposing unlawful employment practices, subjecting him to increased scrutiny and harassment, and ultimately terminating him, in violation of the NYCHRL.

156. As a direct and proximate result of Defendant's unlawful and discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, as well as economic damages, for which he is entitled to an award of monetary damages, attorney's fees and other relief.

157. Defendant's unlawful, retaliatory, and discriminatory actions were intentional, done with malice, and/or showed a deliberate, willful, and wanton and reckless indifference to Plaintiff's rights under the NYCHRL, entitling Plaintiff to an award of punitive damages.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rule of Civil Procedure, Plaintiff demands a trial by jury as to all issues so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the following relief:

a. That Defendant be declared to have violated the aforementioned statutes and laws;

b. Damages to make Plaintiff whole for all earnings he would have received but for Defendant's unlawful treatment, including but not limited to, wages, bonuses, health care coverage, and other lost benefits, including future lost wages and benefits;

c. Compensatory damages for all emotional distress, suffering, humiliation, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

d. Punitive damages in an amount to be determined by the jury;

e. Prejudgment interest at the statutory rate of 9%;

f. An award for the costs of this action, including expert witness fees, together with reasonable attorneys' fees; and

g. Awarding such other and further relief as this Court deems necessary and proper.

Dated: September 23, 2026
New York, New York

**GISKAN SOLOTAROFF & ANDERSON LLP**

By: Julia Elmaleh-Sachs

Julia Elmaleh-Sachs
1 Rockefeller Plaza, 8th Floor
New York, NY 10020
jelmaleh-sachs@gslawny.com

**TAKEROOT JUSTICE**

By: Samantha Wilhelm

Samantha Wilhelm
Kimberly Fayette
123 William Street, Suite 401
New York, NY 10038
swilhelm@takerootjustice.org
kfayette@takerootjustice.org

*Attorneys for Plaintiff*